UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CRIMINAL ACTION NO.: 5:07-CR-33-R

UNITED STATES OF AMERICA                                                PLAINTIFF

v.

MICHELLE L. LOVELACE (1)
LINDSEY A. BROOKS (2)                                                DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court upon the Motion of Defendant Michelle L. Lovelace to Dismiss the Indictment (Docket #27). The Court has granted the motion of Defendant Lindsey A. Brooks to join in Defendant Lovelace's motion. Defendant Brooks filed a memorandum in support of her Motion to Join (Docket #32). The United States has responded to the Motion to Dismiss the Indictment (Docket #34) and Defendant Lovelace has replied (Docket #37). This matter is ripe for adjudication. For the following reasons, the Motion to Dismiss the Indictment is **DENIED.**

## BACKGROUND

Defendants Michelle L. Lovelace ("Lovelace") and Lindsey A. Brooks ("Brooks") were indicted by a federal grand jury on December 3, 2001. Count I of the indictment charges Lovelace with violating 18 U.S.C. § 1001, False Statement to a Federal Agent. Count II of the indictment charges both Lovelace and Brooks with violations of 18 U.S.C. § 1001 and 18 U.S.C. § 2, Aiding and Abetting. On December 4, 2007, Lovelace entered a not guilty plea as to both Counts I and II, and Brooks entered a not guilty plea as to Count II.

The indictment alleges that on or around September 22, 2007, two women, Tracey Burke and Karen Comer, were murdered in Rineyville, Hardin County, Kentucky, at the residence of

Ms. Comer.  The Kentucky State Police (KSP) began an investigation of the murder that same day, and the main suspect was the husband of Ms. Burke, B.B., who at the time was a sergeant with the United States Army, assigned to the Military Police at Fort Campbell.  At approximately 8:00 p.m. on September 11, 2007, B.B. was interviewed by KSP detectives concerning the murders.  The police were particularly interested in obtaining specific information of B.B.'s whereabouts from the time he departed his assigned job at Fort Campbell around 10:20 p.m. on September 10, 2007, and 6:35 a.m. on September 11, 2007, when B.B. was observed to be present in his assigned room on the Fort Campbell base.

The indictment alleges that during his interview with KSP detectives, B.B. falsely stated that he was with Lovelace and Brooks in a parking lot adjacent to the Emergency Communication Center (ECC) on the Fort Campbell base, where both Lovelace and Brooks were employed, from shortly after he departed his work assignment until 1:00 a.m. on September 11, 2007.  The indictment also alleges that after providing this statement to the detectives, B.B. placed a telephone call to Lovelace, advising her that his wife had been murdered earlier that day and that Lovelace would be questioned by law enforcement investigators about the murders of Ms. Burke and Ms. Comer.  B.B. specifically told Lovelace that she would be questioned about B.B.'s whereabouts on the evening of September 10 and the early morning hours of September 11.  The indictment alleges that during the same call, B.B. told Lovelace that she should falsely state to law enforcement investigators that she and Brooks were both with B.B. in the parking lot adjacent to the ECC until 1:00 a.m. on September 11, 2007.  B.B. also told Lovelace to tell Brooks to provide investigators with the same information.

The indictment alleges that Lovelace and Brooks both knew that they parted company

2

with B.B. at approximately 11:30 p.m. on September 10, 2007, and neither saw him or had contact with him during the morning hours of September 11, 2007.

On September 13, 2007, special agents with the Defense Criminal Investigative Service (DCIS) joined the investigation, and on September 14, 2007, as part of its investigation, special agents with DCIS interviewed Lovelace and Brooks.  The Defendants were asked questions about what each knew concerning the whereabouts of B.B. after he got off work from his work assignment at Fort Campbell at around 10:20 p.m. on September 10, 2007.

Count I of the indictment charges Lovelace with a violation of 18 U.S.C. § 1001 and alleges that on or about September 14, 2007, on the Fort Campbell United States Army Base, Lovelace knowingly and willfully made false, fraudulent, and fictitious material statements and representations, knowing those statements to be false, fraudulent, and fictitious, during an interview with special agents of the DCIS.  Count I alleges that Lovelace told the agents that B.B. was in her company, and the company of Brooks, in a parking lot adjacent to the ECC on the Fort Campbell base until 1:00 a.m. on September 11, 2007, when she knew that this statement was false because she parted company with B.B. at approximately 11:30 p.m. on September 10, 2007.

Count II of the indictment charges Brooks with a violation of 18 U.S.C. § 1001 and alleges that on or about September 14, 2007, on the Fort Campbell United States Army Base, Brooks knowingly and willfully made false, fraudulent, and fictitious material statements and representations, knowing those statements to be false, fraudulent, and fictitious, during an interview with specific agents of the DCIS.  Brooks told the agents that B.B. was in her company, and the company of Lovelace, in a parking lot adjacent to the ECC on the Fort

Campbell base until 1:00 a.m. on September 11, 2007, when she knew that this statement was false because she parted company with B.B. at approximately 11:30 p.m. on September 10, 2007.

Count II also charges Brooks and Lovelace with violations of 18 U.S.C. § 2, aiding and abetting.

DCIS Special Agent Michael Collins ("Collins") interviewed Lovelace on September 14 and 15, 2007. During the interview on September 14, Lovelace told Collins that from 11:00 p.m. on September 10, 2007, until 1:00 a.m. on September 11, 2007, she, Brooks, and B.B. were together in the parking lot of the ECC. Lovelace told Collins that at 1:00 a.m. she left the parking lot and drove home, during which time she placed a short call to B.B., who told her he was in his barracks and did not want to wake his roommate.

The interview was then suspended for approximately thirty minutes while the DCIS agents interviewed another employee of the ECC. When Collins returned to Lovelace, she recounted a phone call with B.B. on the afternoon of September 11, 2007, and reiterated the 11:00 p.m. to 1:00 a.m. time sequence. According to the United States, the agents advised Lovelace that they did not think she had been truthful and advised her of the consequences of providing false statements. Lovelace then told the agents that she was not with B.B. in the ECC parking lot until 1:00 a.m. on September 11, 2007, but that she and B.B. separately drove away from the parking lot at 11:30 p.m. on September 10, 2007. Lovelace also told Collins that when B.B. called her around 9:00 p.m. on September 11, 2007, he told her to tell authorities, and to tell Brooks, that the three of them were in the parking lot next to the ECC until 1:00 a.m. on September 11, 2007.

On September 15, 2007, Lovelace provided a handwritten sworn statement to Collins,

4

acknowledging that she parted company with B.B. and Brooks around 11:30 p.m. on September 10, 2007, and that B.B. called her around 9:00 p.m. on September 11, 2007, he told her to tell authorities, and to tell Brooks, that the three of them were in the parking lot next to the ECC until 1:00 a.m. on September 11, 2007.  The statement also acknowledges that she did not tell Collins the truth during the first part of her September 14 interview, but that after she was advised of the consequences of making false statements, she told the truth.

DCIS Special Agents Collins and Jared Camper ("Camper") interviewed Brooks on September 14, 2007, at the ECC.   During that interview, Brooks told the agents that she stayed in the parking lot of the ECC with B.B. and Lovelace until about 1:00 a.m., when Lovelace left the parking lot in her car with B.B.  Brooks said she then reentered the ECC to get on the Internet to look for information about Britney Spears' video music awards performance.

The agents continued to question Brooks about the events of the night of September 11, 2007.  Brooks told the agents that she specifically remembered the ECC clock changing to 00:00 hours (or 12:00 a.m.) after Lovelace and B.B. departed the parking lot, but then immediately corrected this statement and said she remembered the clock changing to 01:00 hours (or 1:00 a.m.).  The agents pressed Brooks on this misstatement, and Collins informed Brooks of the consequences of lying to federal agents.

Brooks then admitted to the agents that she had been told by Lovelace that B.B. wanted them to say they were with him until 1:00 am., but that she knew it was not 1:00 a.m. when Lovelace and B.B. left the parking lot.  Brooks told them she wasn't sure of the time, but estimated it was between 12:00 and 12:30 a.m. when Lovelace and B.B. left and she reentered the ECC.

On September 15, 2007, Brooks also provided a handwritten statement to the agents.  In the statement, Brooks admitted that she was not with B.B. and Lovelace until 1:00 a.m., underlining the word "not."  She estimated that the time she reentered the ECC to be between 12:00 and 12:30 a.m. in the early morning hours of September 11, 2007.

## DISCUSSION

The Defendants argue that the Indictment should be dismissed because: (1) their prosecution under 18 U.S.C. § 1001 violates the Due Process Clause of the Fifth Amendment because they both recanted their initial false statements and told the truth before their respective interviews were completed; and (2) their prosecutions are in violation of the Due Process Clause of the Fifth Amendment because recantation to a perjury charge (18 U.S.C. § 1623) is a defense, whereas a recantation is not a defense to a false statement charge (18 U.S.C. § 1001).

The elements of the false statement charge pursuant to 18 U.S.C. § 1001 are: (1) the making of a statement; (2) the falsity of such statement; (3) knowledge of the falsity of such statement; (4) relevance of such statement to the function of a federal department or agency; and (5) the false statement was material.  *United States v. Hixon*, 987 F.2d 1261, 1266 (6th Cir. 1993),

To be material, the statement must have a natural tendency to influence, or be capable of influencing a decision, but it need not have been actually influential.  *United States v. Chandler*, 752 F.2d 1148, 1151 (6th Cir.1985); *United States v. Dedhia*,134 F.3d 802, 806 (6th Cir. 1978). Knowledge by the government agent that the statement is false does not alter the materiality of the statement.  *United States v. LeMaster*, 54 F.3d 1224, 1230-31 (6th Cir. 1995).

## 1.  Recantation

6

The Defendants argue that because they both admitted to lying and told the truth before the completion of their respective September 14, 2007, interviews with the DCIS agents, their prosecutions under 18 U.S.C. § 1001 violate due process.  18 U.S.C. § 1001 does not contain a recantation defense, however.  *United States v. Beaver*, 2008 U.S. App. LEXIS 2419, at *31 (7th Cir. Feb. 4, 2008) (citing *United States v. Sebaggala*, 256 F.3d 59, 64 (1st Cir. 2001)).  The Defendants acknowledge this, and instead assert that because they "almost immediately" recanted their false statements before their interviews concluded, they cannot be charged with a false statement offense.

The Defendants attempt to distinguish from their own facts multiple cases where defendants who "recanted" false statements in various ways were still found to be properly charged with making false statements, and instead attempt to apply the rationale used by the Eight Circuit in *United States v. Cowden*, 677 F.2d 417, 418 (8th Cir. 1982).  *Cowden*, however, has been distinguished as a minority position and has been limited to its facts by multiple circuits, and the Court declines to accept the Defendants' invitation to apply the specific outcome of *Cowden* to this case.

In *Cowden*, the defendant first denied to a customs official at a Minnesota airport that he had goods to declare.  *Cowden*, 677 F.2d at 418.  When the defendant arrived at customs he handed over his declaration form.  *Id.*  Question 11 on the form asked whether the traveler is carrying over $5,000.00 in monetary instruments, and the defendant had checked 'no.'  *Id.*  The customs official began a search of the defendant's briefcase.  *Id.*  In doing so, the official felt a flap at the bottom of the briefcase, and, upon lifting the flap slightly, felt a parcel below the flap.  *Id.*

7

The official concealed his movements from the defendant, and then asked him if there was anything else he wished to add to his declaration. *Id.* The defendant answered "no," and volunteered nothing else. *Id.* The official then asked whether the defendant was carrying over $5,000.00 in coin, currency or monetary instruments. *Id.* The defendant "immediately responded, "'Yes, I would like to amend my declaration at this time.'" *Id.*

However, the defendant was not immediately allowed to amend his declaration. *Id.* His baggage was searched, the parcel was removed from the briefcase, and it was found to contain $578.00 worth of foreign currency and $15,218.00 in United States currency. *Id.* The defendant was charged with a violation of 18 U.S.C. § 1001, and a jury found him guilty of the alleged offense. *Id.*

The Eighth Circuit held that the currency was not found before the defendant's attempted amendment. *Id.* at 420. The court found it "manifestly unfair that a customs officer should make every effort to conceal his discovery of an item and then, once a passenger has requested to amend his declaration, to forbid amendment." *Id.* at 421. The court further stated that the defendant's conviction had to be reversed "[o]n the facts of this case, and because we conclude that the government's conduct contributed to the ultimate existence of a material false statement." *Id.* Essentially, because the defendant indicated that he would like to amend his declaration before the money was actually found in his briefcase, it was improper for the government to have disallowed the amended declaration.

*Cowden* has been distinguished by multiple courts. In *United States v. Fern*, 696 F.2d 1269 (11th Cir. 1983), the defendant was charged with making a materially false statement to an Internal Revenue Service Tax auditor. *Fern*, 696 F.2d at 1271. The defendant was an

8

accountant who falsely stated to an auditor that his client being audited found a $25,000 donation to a church that he had not claimed as a charitable donation. *Id.* at 1271-72. The auditor accepted it as a deduction and was prepared to execute a report including the charitable donation, "which would have resulted in an offer of an agreement regarding [the client's] tax liability." *Id.* at 1274-75. However, the defendant recanted his statements after the IRS became suspicious. *Id.* at 1272.

The *Fern* court rejected the defendant's argument that there could be no criminal liability under Cowden because he subsequently orally recanted his statement. *Id.* at 1275. The court stated that in *Cowden*, the defendant tried to amend his declaration before the undeclared currency was actually found, which was "inapposite to the case sub judice where Fern apparently changed his story only after the Internal Revenue Service became suspicious." *Id.* Thus, because the defendant only recanted his story about the charitable donation after the government suspected that he had provided a false statement, his recantation did not affect his criminal liability under 18 U.S.C. § 1001.

Similarly, in *United States v. Salas-Camacho*, 859 F.2d 788 (9th Cir. 1988), the Ninth Circuit found that the defendant was properly charged under 18 U.S.C. § 1001, distinguishing *Cowden*. *Salas-Camacho*, 859 F.2d at 791. The defendant, Salas-Camacho, was stopped at the primary inspection station at the port of entry into the United States from Mexico at San Ysidro, California. *Id.* at 789. He told the customs inspector that he was not bringing back anything from Mexico, but the inspector "observed that he was nervous and overly friendly," and referred him to the secondary inspections area because of that behavior. *Id.*

The defendant told the inspector at the secondary station that he was not bringing

9

anything back from Mexico.  The inspector entered his name in the Department of Treasury computer system, and learned that the defendant "had been previously arrested at the San Ysidro port of entry in possession of undeclared steroids."  *Id.*  The inspector confronted the defendant with this information, and the defendant "admitted that he had been stopped before and that he presently had steroids in his truck."  *Id.*

The *Salas-Camacho* court rejected any contention under *Cowden* that the defendant's second denial that he was brining anything back was not a material statement because it was immediately corrected by a true oral statement."  *Id.* at 791.  The court distinguished *Cowden* because although there, like Salas-Camacho, "the defendant first denied that he had goods to declare," the defendant in *Cowden* sought to amend his declaration without being confronted with his falsehood.  *Id.* at 791-92.  In contrast, Salas-Camacho "'only made his declaration once he was confronted with the imminent inspection of his vehicle and the revelation that the inspector knew of his earlier stop for importing steroids into the United States."  *Id.* at 792. Therefore, the court concluded, it could not be said that Salas-Camacho's false statement to the second inspector "'was almost immediately corrected by a true oral statement.'"  *Id.* (quoting *Cowden*, 677 F.2d at 420).

*Cowden* was distinguished most recently in *United States v. Beaver*, 2008 U.S. App. LEXIS 2419 (7th Cir. 2008).  In *Beaver*, the defendant was charged with making false statements regarding his participation in a price-fixing conspiracy with ready-made concrete producers in the Indianapolis metropolitan area to an FBI agent investigating the conspiracy. *Beaver*, 2008 U.S. App. LEXIS 2419, at *3-4.  The defendant was convicted under 18 U.S.C. § 1001 for falsely stating to an FBI agent neither he, nor his company Beaver Materials,

participated in the conspiracy.  *Id.* at *24.  The defendant argued on appeal that his false statements "could not have influenced the FBI's investigation because his attorney...contacted the Department of Justice to correct the statements before they could lead the FBI astray."  *Id.* at *25.

The court rejected this assertion because first, the record did not support his contention that he attempted to correct his false statements, because the letter his attorney sent to the Department of Justice did not say that the defendant "made false statements to the FBI; the letter merely stated that one of the employees of Beaver Materials 'misstated' that 'he' was not at a" certain meeting of the alleged conspirators.  *Id.* at *30.  The court stated that this "corrected" could refer to any Beaver Materials that spoke with FBI agents on May 25, 2004, but could not be understood as an admission by the defendant that he misled the FBI.  *Id.*  In fact, the court said, the "letters vague language perpetuated [the defendant's] lies by implying that someone else had misled the FBI."  *Id.*

Moreover, the court stated, § 1001 does not contain a recantation defense.  *Id.* at *31.  The court did not allow the defendant to impute such a defense by citing to *Cowden*, "one case in which a circuit court of appeals held that a criminal defendant can escape prosecution under § 1001 by correcting false statements 'almost immediately'" *Id.*  (quoting *Cowden*, 677 F.2d at 420).  The *Beaver* court stated that the defendant did not attempt to recant his false statements "almost immediately," because the attorney did not send the letter under three days after the defendant lied to the FBI.  *Id.*

In support, the court cited *Salas-Camacho,* as "distinguishing *Cowden* and declining to find false statements immaterial when defendant corrected statements only when confronted by

11

federal agents," *Salas-Camach*o, 859 F.2d at 792, and *Fern*, as "distinguishing *Cowden* and declining to find false statements  immaterial when defendant corrected statements only once Internal Revenue Service became suspicious," *Fern*, 696 F.2d at 1275.  In the face of Congressional silence on the issue, the *Beaver* court decline to read a recantation defense into § 1001.  *Id.* at \*32 (citing *United States v. Sebaggala*, 256 F.3d 59, 64 (1st Cir. 2001) ("[W]e see no basis for writing into section 1001 a recantation defense that Congress chose to omit.  After all, 'courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so.'" (quoting *Brogan v. United States*, 522 U.S. 398, 408 (1998))).

## A.  Materiality of the False Statements

An indictment must meet a two-prong test in order to be sufficient: (1) it must set out all of the elements of the charged offense and give notice to the defendant of the charges she faces; (2) it must be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts.  *United States v. Martinez*, 981 F.2d 867, 872 (6th Cir. 1992).  The elements of a violation of 18 U.S.C. § 1001 for the making of a false statement or representation are: "(1) the making of a statement; (2) the falsity of such statement; (3) knowledge of the falsity of such statement; (4) relevance of such statement to the functioning of a federal department or agency; and (5) that the false statement was material." *Hixon*, 987 F.2d at 1266.  As this Court held in its January 31, 2008, order denying the Defendants' first motion to dismiss the indictment , the Indictment sufficiently sets out all of these elements as to both Defendants.

Essentially, the Defendants argue that because they recanted their false statements in what they argue was an "almost immediate" fashion, those statements cannot be deemed

'material,' as required by the fifth false statements element, but were instead 'immaterial.' Thus, they argue, the Indictment should be dismissed because it does not properly charge them with making false statements and their prosecution violates the Due Process Clause.

"Materiality under § 1001 is a question of law." *Chandler*, 752 F.2d. at 1150 (citing *United States v. Abadi*, 706 F.2d 178, 180 (6th Cir.), cert. denied, 464 U.S. 821 (1983)). The prosecution is not responsible for proving this element of a false statements charge beyond a reasonable doubt. *Id.* at 1151. Instead, materiality is a "'judicially-imposed limitation to insure the reasonable application of the statute.'" *Id.* (quoting *Abadi*, 706 F.2d at 180 n.2). The element is intended "'to exclude trivial falsehoods from the purview of the statute.'" *Id.* (quoting *Abadi*, 706 F.2d at 180). To be material, the false statement must have a natural tendency to influence, or be capable of influencing a decision, but it need not have been actually influential. *Id.*

As recounted above, multiple courts have declined to find false statements immaterial when the defendant corrected his statements only when confronted by federal agents with the falsity of the statements. Here, the Government argues that both Defendants recanted their false statements to the DCIS agents only after being confronted by the agents. The degree to which the Defendants were confronted with their false statements, however, is in dispute, because the Defendants seem to argue that they essentially "volunteered" the truth without being confronted with their specific lies. The Court has reviewed the documents most pertinent to this recantation issue: (1) the September 15, 2007, handwritten statements of both Lovelace and Brooks, and (2) the September 18, 2007, narrative reports of the separate September 14, 2007, interviews of Lovelace and Brooks, prepared by DCIS Agents Camper and Collins, respectively.

The Governments asserts that Lovelace changed her statement after "further questioning"

13

including "advising her they did not think she had been truthful with them, that she had probably committed a false statements crime, and advising her of the consequences of the offense."  The September 15, 2007, handwritten statement of Lovelace recounts the falsehoods she provided to the DCIS agents and then states: "During my second interview Special Agent Collins advised me of the consequences making [sic] false statements.  It was then that I realized that I needed to tell them the truth..."  The September 18, 2007, narrative of the September 14, 2007, interview of Defendant Lovelace, provided by the DCIS, states, "After further questioning by interviewing agents, Lovelace confessed...."

Defendant Lovelace argues that there is nothing in the Collin's narrative of Lovelace's interview to support the Government's assertion that he advised Lovelace that "he did not think she had been truthful" or "that she had probably committed a false statements crime."  Lovelace also argues that the Government's claim cannot be reasonably inferred from her handwritten statement, and is not otherwise supported by the record.  Lovelace argues that she told the truth when Collins explained the consequences of *any* deception, and not when confronted with the suspicion that she had already made false statements.

However, the Court finds that there is sufficient evidence contained in the narrative and in Lovelace's own statement to support the materiality element of the 18 U.S.C. § 1001 charge against Lovelace.  From the evidence submitted, it appears that Lovelace corrected her false statements, which, if not recanted, would have most certainly influenced the investigation, only after being confronted, to some degree, by federal agents with the falsity of her statements.  Therefore, the Indictment shall not be dismissed as to Defendant Lovelace on this ground.

As for Defendant Brooks, the Government asserts that the "further questioning" took a

14

somewhat similar form to that of Lovelace. The Government argues that once Brooks made the misstatement about the clock in the dispatch center changing to 00:00 hours after Lovelace and B.B. departed the parking lot, and then corrected herself and said it was 01:00 hours, and was confronted with this misstatement, she only then told the truth. Further, the Government asserts that it already knew Brooks was lying because the agents had already spoken to Lovelace. Knowledge by the government agent that the statement is false does not alter the materiality of the statement, *LeMaster*, 54 F.3d at 1230-31, as long as the statement has a natural tendency to influence a federal agency's decision or is capable of influencing a decision, even if is was not actually influential. *Chandler*, 752 F.2d at 1151.

The September 18, 2007, narrative report of the September 14, 2007, interview with Defendant Brooks, provided by the DCIS, simply states "After further questioning by interviewing agents, Brooks confessed..." Brooks' September 15, 2007, handwritten statement explains why she lied to the DCIS agents, but does not state that she was advised by agents about the consequences of making false statements or why she chose to recant.

However, the fact that neither the narrative nor the handwritten statement explicitly states "Brooks recanted her false statements only after being clearly informed by the DCIS agents that they knew she was lying" does not warrant dismissing the Indictment as to Defendant Brooks. The Court can neither determine that Brooks immediately and voluntary recanted her false statement without any confrontation from the DCIS agents nor that she corrected her falsehoods only after such a confrontation. Brooks' false statements to the agents were material. Like Defendant Lovelace's statements, Brooks' lie concerning the whereabouts of herself, Lovelace, and B.B. at 1:00 on September 11, 2007, were capable of influencing that investigation, and the

15

fact that the DCIS agents already knew that Brooks was lying does not alter the materiality. *LeMaster*, 54 F.3d at 1230-31.  Therefore, the Indictment shall not be dismissed as to Defendant Brooks on this ground.

Further, as noted above and below, 18 U.S.C. § 1001 does not contain a recantation defense.  This Court cannot dismiss the indictment against the Defendants, in which they are charged with violating § 1001, on the grounds that they allegedly recanted their lies to the DCIS agents before their respective interviews were completed, which is a defense that does not currently exist.

For these reasons, the Court declines to dismiss the indictment on the grounds that the Defendants' prosecution under 18 U.S.C. § 1001 violates the Due Process Clause of the Fifth Amendment because they both recanted their initial false statements and told the truth before their respective interviews with DCIS agents were completed.

## 2.  Due Process

The Defendants ask this Court to dismiss the Indictment because while the perjury statute, 18 U.S.C. § 1623, contains a recantation defense, the false statement statute under which the Defendants have been charged does not contain such a defense.  The Defendants argue that this violates due process.  However, this Court agrees with other courts that have declined to write a recantation defense into § 1001.  Whatever policy reasons the Defendants may advance for such a reading, it is simply beyond the purview of this Court.

As noted above, in *Beaver*, the Seventh Circuit declined the defendant's invitation "to interpolate a recantation defense into § 1001" given Congress's silence on the issue.  *Beaver*, 2008 U.S. App. LEXIS 2419, at *32.

16

In *United States v. Sebaggala*, the First Circuit was also faced with this exact issue.  In *Sebaggala*, the defendant was found guilty of making false statements on customs forms. *Sebaggala*, 256 F.3d at 61.  The defendant, mayor of the capitol city of Kampala, Uganda, entered "the United States at Logan International Airport, Boston, Massachusetts, on January 1, 1998, carrying approximately $108,000 worth of travelers' checks (more than half of which had been reported lost or stolen)." *Id.* at 62.  However, on his customs form" he declared that he was not carrying currency or monetary instruments in excess of $ 10,000." *Id.*  He was questioned about this declaration and "reaffirmed that he had less than  that he had less than $ 10,000 in currency or monetary instruments in his possession," stating that "he had $ 4,000 in travelers' checks." *Id.*

The defendant was then taken to an interview room, where upon further questioning he admitted carrying $40,000 and completed a new declaration form. *Id.*  He consented to a search of his baggage, which "revealed the full extent of the travelers checks in his possession." *Id.*

On appeal of his false statements conviction, the defendant argued that his second declaration that he was carrying over $10,000 in currency equivalents "amended" and negated his first, false statement and should be analogized to perjury cases. *Id.* at 64.  The Court refused to make the analogy, stating:

> Although an individual sometimes can avoid a perjury prosecution by recanting a prior false statement, that result flows from a specific statutory provision applicable only to perjury cases. The statute under which the appellant was charged and convicted is devoid of any comparable safe harbor; it simply provides for criminal consequences if a person "knowingly and willfully makes any materially false, fictitious, or fraudulent statement or representation" in a matter within the government's jurisdiction. 18 U.S.C. § 1001. The appellant cites no authority that would support transplanting the provisions of section 1623(d) into the unreceptive soil of section 1001. For our part, we see no basis for writing into section 1001 a recantation defense that Congress chose to omit. After all, "courts may not create their own limitations on legislation, no matter how alluring the

17

policy arguments for doing so." *Brogan v. United States*, 522 U.S. 398, 408 (1998).

The Court chooses to follow the lead of *Beaver* and *Sebbagala*, and will not act as a legislator and create a recantation defense in 18 U.S.C. § 1001 where none exists.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss the Indictment is

**DENIED**.

An appropriate order shall issue.